IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JOSHUA ALAN WILLIAMS                                              PLAINTIFF

v.                          No. 4:09-cv-459-DPM

JEFFREY ANDERSON and
TESCO SERVICES, INC.                                              DEFENDANTS

CHARTIS CASUALTY COMPANY/
AMERICAN INTERNATIONAL SOUTH
INSURANCE COMPANY and GLOBAL
RECOVERY SERVICES                                                 INTERVENORS

ORDER

1. Several months ago, the Court entered a comprehensive order denying various motions for summary judgment and motions to exclude proposed expert testimony. *Document No. 149.* On one point (Anderson and his employer TESCO Services's motion for summary judgment based on no duty), the Court denied without prejudice. The Court indicated that it wanted to reconsider this issue: it requested "focused excerpts from the evidentiary record on [certain] facts[,]" and "anything else in the record

that illuminates the hectic nature of the work at the well and how the various companies on site managed working with and around each other." *Document No. 149, at 12-13*. The Court also requested further legal argument on Anderson's common-law duty to Williams. *Id. at 13*. The parties have filed their papers. And the Court appreciates them.

2. There are two threshold matters. First, Anderson and TESCO move to strike Williams's exhibits 154-2, 154-3 and 154-4—a new report from Williams's expert, Perkin, and two Recommended Practice Standards from the American Petroleum Institute. Second, Williams moves to amend his complaint and assert a failure-to-train theory directly against TESCO, supplementing his current *respondeat superior* theory.

Anderson and TESCO's motion to strike is granted. The Court did not reopen the summary-judgment record. Instead, the Court requested focused excerpts from the existing record. Discovery closed long ago. And while the Rules allow supplemental expert opinions in certain circumstances, Williams's deadline for disclosing expert opinions passed in October 2010. *Document No. 58*. In the circumstances here, the Court declines to expand the record with the new materials.

-2-

Williams's motion to amend his complaint is denied. Trial is about five weeks out; the deadline for proposing pleading amendments passed in June 2010. As the Court recognized in its recent order, Williams's failure-to-train theory rises or falls as a matter of law on the duty question. TESCO would be unfairly prejudiced by a belated amendment asserting direct liability on the threshold of trial. While some discovery has touched on TESCO's alleged failure to train, the matter is underdeveloped. And it would be unfair to inject this new theory now when more discovery and motion practice cannot be done.

3. Anderson and TESCO's duty is a matter of law for the Court. *Coca-Cola Bottling Co. of Memphis, Tennessee v. Gill*, 352 Ark. 240, 254, 100 S.W.3d 715, 724 (2003). The scope of that duty is defined in part by the parties' relationship "because an act is never negligent except in reference to, or toward, some person or legally protected interest." *Hill v. Wilson*, 216 Ark. 179, 183, 224 S.W.2d 797, 800 (1949). Foreseeability finishes defining the scope. The question, in general terms, is whether a reasonably careful person in Anderson and TESCO's shoes "would foresee such an appreciable risk of harm to others as to cause [them] not to do the act, or to

do it in a more careful manner." *Ethyl Corp. v. Johnson*, 345 Ark. 476, 481, 49 S.W.3d 644, 648 (2001) (quotation omitted). Anderson and TESCO had no duty to guard against risks they could not reasonably foresee. *Ibid.*

Anderson and TESCO had the duty to use ordinary care in fulfilling TESCO's obligations under the casing contract. Here Williams is correct: in its earlier order, the Court moved too quickly past the TESCO/Southwestern Energy contract. *Document No. 149, at 12.* The contract informs the duty question. *E.g., The Shaw Group, Inc. v. Marcum*, 516 F.3d 1061, 1065–67 (8th Cir. 2008). The Shaw Group's contract with the Army prescribed specific duties, which the parties essentially agreed determined The Shaw Group's tort duties to the soldier. 516 F.3d at 1065. The facts presented a jury question on whether The Shaw Group exercised ordinary care in fulfilling those duties. 516 F.3d at 1065–67.

The TESCO/Southwest Energy contract about safety is general by comparison. The text of the safety provision of the parties' contract is in the margin.* TESCO promised to provide "continuous adequate

---

*19. SAFETY, HEALTH AND ENVIRONMENTAL POLICY
19.1 [TESCO] shall provide continuous adequate protection of Work, [Southwestern Energy's] property and adjacent property, and take all necessary precautions to keep and maintain the

workplace free from recognized hazards caused by [TESCO], its employee, agents and others under [TESCO's] control which are likely to cause death, illness or injury to persons or damage to property. [TESCO] shall comply and cause [TESCO's] employees, agents and others under [TESCO's] control entering upon [Southwestern Energy's] Premises in the performance of Work or in connection therewith to comply with all applicable safety, health, and environmental rules of [Southwestern Energy] (as contained in the most current Southwestern Safety and Health Manual provided to [TESCO] under this Agreement) together with all applicable provisions of federal, state or local safety, health, and environmental laws, rules, regulations or orders. This provision will not require [Southwestern Energy] to police [TESCO's] compliance with any safety, health, and environmental rules, laws, regulations or orders and shall not impose any obligation on the part of [Southwestern Energy] under such rules, laws, regulations or orders. Nothing contained in this paragraph shall be interpreted as enlarging the legal duty of [Southwestern Energy] to [TESCO] or [TESCO's] agents, employees, and others under [TESCO's] control or altering the status of [TESCO] as set forth in this Agreement.

19.2    [TESCO] shall not commence Work if [TESCO] has not familiarized itself with [Southwestern Energy's] safety, health and environmental rules which are available for [TESCO's] review upon [TESCO's] request. In addition, [TESCO] must have all required safety equipment prior to commencement of Work. [Southwestern Energy] shall be under no obligation to pay [TESCO] any amount when [TESCO's] employee(s) and/or subcontractor(s) is not permitted to perform Work due to lack of safety equipment. Additionally, [TESCO] may be liable to [Southwestern Energy] for any incremental costs incurred (e.g., extra logistics costs) if immediate removal of [TESCO's] employee(s) and/or subcontractor(s) is required or Work is delayed due to [TESCO's] failure to meet all safety requirements.

19.3    Subparagraphs 19.1 and 19.2 in this Paragraph 19 are agreed to by both [Southwestern Energy] and [TESCO] to be of the highest importance. A breach or violation of any of the terms of Paragraph 19 of this Agreement by [TESCO] will be considered to be a material and substantial breach of this Agreement. If [TESCO] fails

protection of Work," that is, of its services at the well. *Document No. 97-3, at 5.* TESCO also promised to "take all necessary precautions to keep and maintain the workplace free from recognized hazards caused by [TESCO], its employee[s], agents and others under [TESCO's] control which are likely to cause death, illness or injury to persons or damages to property." *Ibid.* TESCO promised that it—"and others under [TESCO's] control"—would comply with Southwestern Energy's safety rules. *Ibid.* TESCO did not promise to police Southwestern Energy's compliance with that company's own safety rules. Nor did TESCO promise to police DeSoto Drilling's compliance with its parent company's safety rules. TESCO's safety obligations were about its own work, not safety obligations of others. Most importantly, the parties' contract did not put TESCO in charge of the drawworks or drawworks safety during casing operations. As to those

---

> to promptly cure said breach or violation or to otherwise comply with Paragraph 19 of this Agreement. [Southwestern Energy] may seek removal of [TESCO] as provided in this Agreement and may take any other action permitted under law or by the terms of this Agreement, including its termination.

*Document No. 97-3, at 5.*

-6-

drawworks, DeSoto Drilling, not TESCO, was the party contractually situated like The Shaw Group.

The undisputed fact is that DeSoto Drilling—Williams's employer—decided how to operate the rig in general and when to move the drawworks in particular. Randy Payne, DeSoto's operations manager, explained in his deposition:

> **Counsel for Anderson/TESCO:** Okay. Having gone through this lawsuit on behalf of Mr. Anderson and TESCO, it appears the biggest criticism that Mr. Williams has with what Mr. Anderson did or didn't do on the rig was that he instructed or directed in some capacity Derrick Long to raise the top drive which caused Josh to have his leg cut off. Who directs and controls the operations on a DeSoto rig, specifically rig number nine?
>
> **Counsel for Williams:** Object as to form as to the preface of the question. Go ahead.
>
> **Witness Payne:** The driller controls his crew. The rig manager has control of the entire operation. It doesn't really matter who tells our people what to do. The person that's operating the rig, whether it's the driller or the [assistant driller], they ultimately assume responsibility of what's going on, knowing what's going on, and if they can or cannot perform that—because we have people out there telling us all the time to pick up, set down, stop, do this, do that, and that's why we have the people we do to make sure that all of that is coordinated and is done correctly.

-7-

**Counsel for Anderson/TESCO:** So irrespective of whether Mr. Anderson said, Pick it up, with a question mark, Pick it up, with an exclamation point or, Pick it up, with a period, it's a DeSoto employee that is the one that makes the decision whether or not to engage the clutch and raise the drawworks. Is that how I understand it?

**Witness Payne:** That is correct.

*Document No. 151-5, at 2–3.*

Beyond DeSoto's undisputed control of the rig and its drawworks, the Court concludes — taking the focused record excerpts in the light most favorable to Williams when disputed — that no genuine issue exists about several other important facts.

- Everyone was in a hurry that night. Concrete trucks were waiting. And DeSoto wanted to resume casing as soon as possible. *Document Nos. 151-2, at 16–18; 97-4, at 42; & 151-1, at 15.*

- TESCO, through Anderson, was responsible for running the TESCO tool. *Document No. 151-2, at 4–10.*

- Anderson was not to begin or resume any casing operations until all the rig workers were in a safe position. *Document No. 97-4, at 13.*

- TESCO depended on DeSoto to move the drawworks and the TESCO tool. *Document No. 151-2, at 4–10.*

-8-

- TESCO personnel were not authorized to operate the drawworks, and DeSoto personnel would stop them if TESCO personnel tried to do so. *Document No. 151-1, at 11-12.*

- Before any casing work began at the well site, TESCO led a safety meeting about casing with DeSoto folks. This meeting was, among other things, to build a sense of teamwork about safety for the work. *Document No. 97-4, at 12-13.*

- Long, DeSoto's assistant driller, was in charge of running the rig the night of the accident.

- Right before the accident, Long's DeSoto supervisors had told him and Anderson to resume casing. *Document Nos. 151-2, at 16-17, & 97-4, at 42.*

- When Long and Anderson got to the rig floor, Long wondered where Williams was, looked up, and could not see him. *Document No. 151-2, at 17*

- When he saw Long look up, Anderson looked up too and did not see Williams either. *Document Nos. 151-2, at 16-17.*

- Then Anderson said, "lift it up," or some encouraging words to that effect, to Long. Anderson needed the drawworks lifted slightly to do some work with a file. *Document No. 151-2, at 17.*

- Whether to move the drawworks was Long's decision. *Document No. 97-7, at 10.*

- Long released the brake, kicked the clutch in, and pushed the throttle. *Document No. 151-2, at 17.*

- Williams was pinned, and badly injured, when the drawworks moved up.

-9-

If Williams had been injured by TESCO's tool when Anderson was operating it, then the duty question would be clear. So, too, if Williams had been injured by Long moving the drawworks with no involvement by Anderson. TESCO's work provided the occasion for the accident. But TESCO's work was dependent on DeSoto Drilling's control of the drawworks. Or to put it in terms of people, Anderson's work was dependent on Long's moving the drawworks up and down. Whether to engage this equipment was Long's decision, a decision already authorized in general — indeed, directed — by Long's bosses. But Anderson needed this step taken and he encouraged it.

*Cobb v. Indian Springs, Inc.*, is illuminating. 258 Ark. 9, 522 S.W.2d 383 (1975). Applying a section from the First Restatement of Torts, the Court emphasized several things: "Big Jim" Babbitt, the security guard at Indian Springs mobile-home park, was in a position of authority over the teenagers; Big Jim suggested to the sixteen-year-old driver that the young man show the group what his 1964 Comet would do; and the guard told the driver to shut the car down when he came over the top of a hill because

of a nearby gas line. 258 Ark. at 12-19, 522 S.W.2d at 384-89. Big Jim's authority and his encouragement loomed large. *Id.* at 16-17, 522 S.W.2d at 387.

The facts here are different. Long, not Anderson, was in control of whether the drawworks moved. Like Big Jim the security guard in the *Cobb* case, Anderson did encourage action. Unlike the teenage driver, however, Long was already under general instructions from his bosses to take action. The teenager's parents had not told him to go drive around and show off what his Comet could do. In sum, Anderson had less authority and gave weaker encouragement than did the security guard whose acts presented a jury question.

The Court is persuaded that the RESTATEMENT (SECOND) OF TORTS § 876 provides a useful rubric too. Anderson did not engage the drawworks in concert with Long. These men had a common design—getting back to work casing. But Anderson's encouraging word was not tortious. RESTATEMENT (SECOND) OF TORTS § 876(a) (1977). Anderson did not, knowing that Long's conduct was in breach of his duty to Williams, give Long substantial assistance or substantial encouragement. RESTATEMENT

(SECOND) OF TORTS § 876(b) (1977). Finally, Anderson did not give substantial assistance at all—he echoed the marching orders Long had already received from his bosses at DeSoto Drilling. RESTATEMENT (SECOND) OF TORTS § 876(c) (1977).

The casing work was, in Anderson's phrase, "a teamwork deal." *Document No. 97-4, at 13*. Collaboration between TESCO and DeSoto was essential; Anderson and Long had to work together. The TESCO/DeSoto collaboration takes the legal issue back to the undisputed facts about control. There was a special relationship by contract, word, and deed between TESCO and DeSoto. But DeSoto Drilling, acting in the persons of Long and his superiors, controlled when and how the drawworks moved. All the circumstances combine to put the duty here on DeSoto, not TESCO. *Smith v. Hansen*, 323 Ark. 188, 195–97, 914 S.W.2d 285, 289 (1996).

The parties' relationship determines both the duty owed and the foreseeability of harm. *Hill*, 216 Ark. at 183, 224 S.W.2d at 800; *see also Shannon v. Wilson*, 329 Ark. 143, 158, 947 S.W.2d 349, 356–57 (1997). The differing relationships among the folks involved in the casing operation therefore resulted in different duties to one another and, in particular, to

Williams. Long, for example, had a special relationship to Williams as his DeSoto co-worker. He also had control over moving the rig's drawworks. This combination of relationship and control meant that Long could reasonably foresee the risk of harm from his actions; and thus he had a duty to guard against that harm.

The relationship running from Williams to Anderson to TESCO, on the other hand, is more attenuated. Anderson and TESCO still owed Williams a duty of ordinary care under the circumstances. But here, ordinary care did not require Anderson and TESCO to foresee that Anderson's encouraging word might push Long—a worker with independent control of the rig and orders from his own bosses—to do something he did not already intend to do. Ordinary care did not require TESCO to guard against Anderson's every word and against all speech of every TESCO employee. Because Anderson's statement did not violate the duty that he and TESCO owed to Williams, the Court vacates its earlier denial without prejudice of Anderson and TESCO's motion for summary judgment. *Document No. 149, at 18.* The motion, as supplemented, is granted.

\* \* \*

Motion to strike, *Document No. 156*, granted. Motion to amend, *Document No. 163*, denied. TESCO and Anderson's motion for summary judgment, *Document No. 106*, granted as supplemented by *Document No. 151*.

The only claims remaining for trial are cross claims among the Defendants. Williams's pretrial motions, *Document Nos. 164 & 166*, and Anderson and TESCO's pretrial motion about Williams's designated deposition testimony, *Document No. 165*, are therefore denied as moot. The Court requests a joint status report from the Defendants about (1) how many days they estimate the trial on their cross claims will take, and (2) which, if any, of TESCO and Anderson's pending pretrial motions, *Document Nos. 165, 169, & 171*, still apply to the trial on the cross claims. This status report is due by 20 April 2012.

So Ordered.

_____
D.P. Marshall Jr.
United States District Judge

16 April 2012